**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | No. 1:23-cr-161 (CRC) |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **RUSELL CAMPBELL,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRE-TRIAL DETENTION OF DEFENDANT RUSELL CAMPBELL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Defendant Russell Campbell be detained pending trial. Defendant is charged by indictment with Unlawful Possession of a Firearm While Under Indictment, in violation of 18 U.S.C. § 922(n), for his possession of a loaded firearm on June 20, 2021. He is further charged with Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1), for his possession of a loaded AK-Style pistol on November 11, 2022, while on probation.

The Government now moves for Defendant's detention pursuant to 18 U.S.C. §§ 3142(d) (offense committed while on release), (f)(1)(E) (a felony involving a firearm that is not a crime of violence), and (f)(2)(A) (flight risk). Under the Bail Reform Act, the Government may proceed at the May 17, 2023, detention hearing by way of proffer. *See*, *e.g., United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 42 (D.D.C. 2013). Pursuant to the facts, circumstances, and authorities presented herein and at the detention hearing, Defendant should be detained.

**FACTUAL BACKGROUND**

*June 20, 2021, Firearm (hereafter, "Gun 1") Recovery*:

On November 8, 2020, Defendant had been charged by complaint in D.C. Superior Court case number 2020 CF2 8559 for Carrying a Pistol Without a License. While on release in that case, on June 20, 2021, Defendant was armed with a loaded firearm in Washington, D.C.

On June 20, 2021, while in the vicinity of the Mobil Gas Station at 2210 Bladensburg Road NE around 12:30 a.m., law enforcement noticed both unusual traffic inside the station and a security guard contacting a group of people congregated around a silver Hyundai. Upon parking at the station, officers heard the security guard asking the group whether they were pumping gas, but the group did not provide a response, nor did anyone appear to be pumping gas. Officers exited their vehicle, and thereupon noticed Russell Campbell's associate manipulating the front of his pants area and dropping an object into the trash can, which ultimately was determined to be a firearm with a giggle switch and extended magazine. Campbell's associate was placed under arrest and ultimately charged.

Around the same time, Special Agent Farrar observed Campbell walking away from the Hyundai and steered him by the elbow back towards the Hyundai. SA Farrar then noticed Campbell adjusting his front waistband area, which caused the imprint of a magazine to become visible in Campbell's waistband area to SA Farrar and the surrounding officers. Almost immediately after patting him down, officers identified that Campbell was armed; they recovered from Campbell's waistband a Glock 45 .9mm, bearing serial number BLPU184, with 23 rounds in the extended magazine, and one live round in the firearm's chamber.



The Hyundai that Campbell and his associates had been clustered around was searched, and therein, officers found a black duffel bag in the front passenger seat with two more firearms – one, a "ghost gun" rifle with a drum magazine containing 102 live rounds and one live round in the chamber; and the other, a Glock 22 .40 caliber handgun with an extended magazine. In the center console was a clear plastic bag with a white-rock substance (5.23g), testing positive for cocaine; and another plastic bag with 26 orange pills marked "3/0", which tested positive for fentanyl. Of note, surveillance shows that Campbell had not exited this Hyundai when he arrived at the gas station; rather he had exited from a different vehicle.

The FBI Laboratory performed DNA testing on swabs from Gun 1, the firearm recovered

from Defendant's waistband.  The DNA profile on the firearm is a mixture of three contributors, and Defendant is included.  It is 1.5 septillion times more likely if Defendant and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors.  The DNA report characterizes this likelihood ratio as "very strong support for inclusion."

Of grave concern to the Government are the NIBIN leads associated with Gun 1, which are detailed *infra*, and which suggest the firearm's use in two separate shootings close in time to its recovery on Defendant's person.

*November 11, 2022, Firearm (hereafter, "Gun 2") Recovery:*

By November 11, 2022, Defendant had pleaded guilty to one count of Carrying a Pistol Without a License ("CPWL") in D.C. Superior Court docket number 2021 CF2 6023 and was under supervision in that matter.  Even so, despite both his felon status and the fact that he was on supervised probation at the time, Defendant occupied a vehicle (hereafter, the "Suspect Vehicle") on November 11, 2022, that contained five firearms, one of which has been forensically linked to Defendant.

On the evening of November 10, 2022, Defendant's associate, Trevor Wright (aka, "Taliban Glizzy"), arranged for a hired driver to pick up Defendant and his associate and transport them to a club in Washington, D.C.  Surveillance from 268 37th Place SE at approximately 5:30 p.m. shows Defendant entering the Suspect Vehicle, carrying a green and black backpack later found to contain an AK-style pistol.



Around 3:00 a.m. on November 11th, Defendant, Wright, and three others left the club in the Suspect Vehicle. U.S. Secret Service ("USSS"), which had had been surveilling Wright, followed the Suspect Vehicle once it left the club. When the Suspect Vehicle ran a red light, USSS performed a traffic stop around 3:11 a.m. in front of 810 7th Street, NW. During that stop, the female occupant in the backseat abruptly exited the vehicle, prompting the other occupants, including Defendant, to exit of their own volition, too. Almost immediately after stepping out of vehicle, Wright fled from the scene and ultimately hid from officers in the Chinatown metro station. When the Suspect Vehicle was stopped, Defendant had been sitting in the driver's-side captain's chair next to where law enforcement found the green and black backpack.

Following a K9's sweep of the Suspect Vehicle and positive indication for the presence of firearms, officers searched the vehicle and recovered five different firearms.[1]  Inside the green and black backpack was Gun 2 – a 5.56 Zastava AK-Style pistol PAP M85PV, bearing serial number M85PV003177, with an extended magazine holding thirty .556 caliber live rounds and one live round in the chamber.



---

[1] Under the driver's seat was a 9mm Glock 26 (S/N YVH326) with 15 live rounds of 9mm ammunition in the magazine and one in the chamber.  Under Campbell's associate's seat were two firearms – a 9mm Glock 19 (S/N ACSZ325) with fifteen live rounds in the magazine and one in the chamber; and a 10 mm Glock 29 (S/N BCNT225), also with fifteen live rounds in the magazine and one in the chamber.  In front of Campbell's associate's seat was a 357 Glock 31 (S/N BEXR714) with an extended magazine containing twenty-two live rounds and one round in the chamber.  Campbell's associate's DNA is included on the Glock 19.

The FBI Laboratory performed DNA testing on the firearms. The DNA profile on the Zastava pistol constitutes a mixture of four contributors. It is 32 sextillion times more likely that Defendant and three unknown, unrelated people are contributors than if four unrelated, unknown are. The report characterizes this likelihood ratio as "very strong support for inclusion." Similarly, the DNA profile on the magazine within the Zastava pistol is a mixture of four, and it is 2.5 million times more likely if the mixture consists of Defendant and three unrelated, unknowns as contributors than if it were composed of four unrelated, unknown contributors. This, too, is characterized as "very strong support for inclusion." Campbell was excluded as a contributor for DNA profiles on the other four firearms in the vehicle.

## **LEGAL STANDARD**

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Moreover, the Government is not required to "spell out in precise detail how the Government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992) (Sporkin, J.). A pretrial detention hearing should not be used as a discovery device, and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210, *see also Williams*, 798 F. Supp. at 36.

The Bail Reform Act requires pretrial detention where a court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §§ 3142(e), (f). In making that determination, a court must consider "(1) the nature and circumstances of the offense charged . . .

7

(2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id*. § 3142(g).

The Government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight—even where it is presumed that those standards are satisfied. *See United States v. Thomas*, No. 21-cr-724, 2022 WL 203083 at *2 (D.D.C. Jan. 24, 2022) (Cooper, J.) (citing *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)).

## ARGUMENT

The Government respectfully submits that there is no condition or combination of conditions that would assure the safety of the community and the Defendant's return to Court.

### I. Nature and Circumstances of the Offenses Charged

The nature and circumstances of the charged offenses weigh in favor of detention. While on supervision in pending D.C. Superior Court cases (docket no. 2020 CF2 8559 for Gun 1, and docket no. 2021 CF2 6023 for Gun 2), Defendant was out in the community in Washington, D.C. with at least one firearm on June 20, 2021, and November 11, 2022, by which point he was a felon. The firearms for which he has been charged were loaded and equipped with extended magazines. Any one of those factors – being a felon in possession of a firearm, and possession of the extended magazines despite being under court supervision – would be concerning, but all are present in this case.

### II. The Weight of the Evidence Against Defendant

The weight of the evidence against Defendant is significant and weighs in favor of

detention. For the June 20, 2021, firearm recovery, not only was Gun 1 found in Defendant's waistband, but DNA results for Gun 1 provide forensic evidence to support Defendant's possession of that firearm.

With respect to Gun 2 recovered on November 11, 2022, the evidence against Defendant is similarly robust. Surveillance clearly captures Defendant carrying the distinct green and black backpack into the very vehicle where the firearm was ultimately recovered. Body worn camera of Defendant when he was detained after the vehicle stop clearly matches his depiction in surveillance from earlier to corroborate that he was the one who brought the backpack into the Suspect Vehicle, and not anyone else – see below for a comparison of surveillance of Defendant entering the vehicle with the backpack (left) and a screenshot from body worn camera of Defendant (right).

 

What's more, DNA evidence strongly links not only the firearm, but the magazine inserted therein, to Defendant. Wright's and Defendant's cellphones also corroborate Defendant's possession of the firearm on November 11, 2022. Wright was arrested in a separate matter on December 11, 2022, and his cell phone was recovered from his person. An extraction of that phone revealed a text conversation between Wright and Defendant on November 10, 2022, during which

9

they coordinated Wright's driver picking the Defendant up at 5:30 p.m., which is when Defendant is seen on surveillance entering the Suspect Vehicle with the bag containing Gun 2. The same conversation is also reflected in Defendant's cell phone that was recovered pursuant to his November 11th arrest and thereafter extracted.

### III. Defendant's History and Characteristics

This factor weighs heavily in favor of pretrial detention given not only Defendant's criminal history, but his pattern of conduct involving the possession of illegal firearms, and his nearly complete noncompliance with supervision in his past cases. Perhaps the defendant's probation officer in the Superior Court cases put it best: "Based on the defendant's egregious non-compliance with his conditions of release and his recent re-arrest, PSA request that he be removed from PSA Supervision."

On October 21, 2020, officers viewing live CCTV from apartment buildings near 340 37th Street SE saw someone retrieving a rifle from a bag. When officers arrived on scene, Defendant and the individual seen with a rifle fled; officers detained the individual with a rifle in addition to Defendant. Officers did not find a firearm on Defendant's person or in his flight path, so he was released, but subsequent review of surveillance revealed Defendant tossing a firearm into the wooded area behind 324 37th Place SE. Officers returned to that location and found a pistol. An arrest warrant for Defendant based on that unlawful firearm possession was executed on November 8, 2020, and Defendant was subsequently charged with Carrying a Pistol Without a License in Superior Court case number 2020 CF2 8559.

While on release in his pending case, Defendant was involved in a shooting on May 19, 2021, at 3:36 p.m., whereby Defendant was shot in the chest, buttocks, and leg. One month later, on June 20, 2021, while still on release in his pending gun case and ordered to remain in home

confinement, Defendant was instead at the Mobil Gas Station while in possession of a loaded firearm. This firearm, Gun 1, is linked via NIBIN lead to two drive-by shootings. The first shooting occurred just five days prior on June 15, 2021, at 3700 Hayes Street NE. There, the suspect drove by Victim-1, who was standing by ITS car, and shot at Victim-1 at least twelve times. Victim-1, who stated that IT did not know who had shot at IT, was transported to the hospital. The second shooting linked to Defendant's firearm, Gun 1, occurred just two days later on June 17, 2021, at 4401 E Street SE. Victim-2 reported that it was hanging out when it heard a vehicle speed in the block followed by 10 to 15 gunshots, which, according to Victim-2, sounded like they came from an automatic rifle. Victim-2 dropped to the ground and then felt that IT had been hit in the back, which Victim-2 sought treatment for at the hospital. Shotspotter detected more than 20 gunshots. Three days later, on June 20, 2021, the firearm involved in both shootings was in Defendant's possession.

Four months later, on October 20, 2021, and still while under court-ordered supervision, Campbell was involved in a shootout in the 200 block of 37th Place SE. As a silver Infiniti drove south in the 200 block of 37th Place SE, CCTV showed Campbell walking across the street to get to the circle where the vehicle was. Once at the middle of the circle, Campbell stopped and pulled out a black handgun with an extended magazine, pointing it at the vehicle. The vehicle stopped, facing northbound on 37th Place SE. A frame-by-frame of the surveillance showed the individual in the vehicle shooting first before Campbell immediately fired back towards the vehicle. The vehicle then fled the scene, leaving Campbell shot in the leg. See below for screenshots from the surveillance.





    Defendant was charged in connection with this October 20, 2021 incident in a second Superior Court case with docket number 2021 CF2 6023. He ultimately plead guilty to Carrying a Pistol Without a License in this new matter on May 25, 2022, and in exchange, the Government agreed to dismiss his then-pending matter, docket number 2020 CF2 8559. On June 7, 2022,

Defendant was sentenced to 6 months' incarceration, with all of that time suspended under the YRA, and with 18 months' supervised probation.

While on supervised probation in 2021 CF2 6023, despite being a felon, and after having been ordered by the Court to not possess any firearms and to register as a Gun Offender, Defendant remained undeterred.  On November 11, 2022, he possessed at least the Zastava AK-style pistol recovered in the vehicle he was stopped in, and notably, that firearm was fully loaded with an extended magazine holding 30 rounds of .556 caliber live rounds, and one in the chamber.

Defendant's penchant for possessing firearms despite his prohibited status is not just confined to the aforementioned incidents, though.  His cellphone obtained from the November 11, 2022 arrest are full of numerous images of him with a variety of firearms.  By way of example, see the below image from his phone of him with four firearms at once.



```
Save

Name:          5003.JPG
Type:          Images
Size (bytes):  31200
Path:          08b50b4ee5cb8b672f67228fc0ac97e032c8bb
               c3_files_full.zip/private/var/mobile/Media/
               PhotoData/Thumbnails/V2/DCIM/100APPLE/
               IMG_0169.HEIC/5003.JPG
Created:       8/7/2022 7:17:31 PM(UTC+0)
Accessed:      8/7/2022 7:17:31 PM(UTC+0)
Modified:      8/7/2022 7:17:31 PM(UTC+0)
Changed:
Deleted:
Extraction:    Phone - File System
MD5:           41268295e8f0646f7ff810bba83a45b7
```

Defendant's music videos glorifying violence and the use of firearms to increase the likelihood of fatalities places his consistent and illegal possession of firearms in a troubling context. In his February 22, 2023 music video, "War General," for instance, Defendant's lyrics include: "I'm toting a switch, I don't fuck with no semis . . . I'm one of the ones that get active. Aye, with that Instagram shit, I'mma crack them. Whole lotta shit going on in this war. Bringing that smoke to these n*****s front door."

At no point has Defendant ever complied with any form of court-ordered supervision,

14

which portends zero compliance if released to less restrictive conditions in the instant matter. As referenced above, in Defendant's first Superior Court case with docket number 2020 CF2 8559, he was released on November 10, 2020, to High Intensity Supervision ("HISP") and a GPS device was installed. As part of his release conditions, he was further ordered to comply with a 10:00 p.m. curfew and Stay Away No Contact ("SANC") Order, in addition to adhering to weekly check-in requirements with the pretrial services agency ("PSA"). As reflected in PSA's November 17, 2021 Request for Revocation (hereinafter, "Exhibit A"), Defendant violated his conditions across the board as follows:

- <u>Removal of GPS device</u> from January 8, 2021, to January 29, 2021. Ex. A at 6 ("the defendant admitted that he removed the GPS unit and it was no longer on his leg"),
- <u>Failure to charge GPS device</u> at least 12 times despite repeated admonitions from PSA. *Id.* at 6-7.
- <u>Violation of curfew requirements</u> at least 11 times, resulting in Defendant being placed on home confinement in early January 2021. *Id.* at 2.
- <u>Violation of home confinement requirements</u> at least 19 times. *Id.* at 2-3. Note that PSA was precluded from confirming Defendant's compliance with home confinement from January 8 to 29, 2021, when Defendant had removed his GPS device. *Id.*
- <u>Violation of SANC requirement</u> at least 36 times between December 3, 2020, and November 17, 2021, despite repeated warnings from PSA.
- <u>Failure to report to PSA</u> by telephone once. *Id.*

This led to PSA to declare "defendant's egregious non-compliance". *Id.* at 1.

Yet again, PSA filed another Request for Revocation on June 6, 2022 (hereinafter, "Exhibit B"), noting that Defendant had violated his curfew requirement at least ten separate times despite receiving a warning from PSA. Ex. B at 2. The next day, on June 7, 2022, the first Superior Court case was dismissed as part of the Government's global plea agreement with Defendant.

15

In his second Superior Court case with docket number 2021 CF2 6023, following Defendant's guilty plea and sentencing, Defendant commenced probationary supervision on June 7, 2022, with an expiration date of December 6, 2023. Probationary conditions include, among other things, Gun Offender Registration, completion of community service, and participation in a Violence Reduction and/or Anger Management Program. Unsurprisingly, Defendant has been woefully noncompliant during that supervision too; Court Services and Offender Supervision Agency ("CSOSA") filed three different Alleged Violation Reports ("AVR") to alert the Superior Court judge, the Honorable Michael Ryan.

On December 19, 2022, CSOSA filed an AVR (hereafter, "Exhibit C"), notifying Judge Ryan of Defendant's continued refusal to engage in the interventions and programming that the court ordered Defendant to participate in as part of his probationary conditions as well as Defendant's continued positive drug tests results for fentanyl. Exhibit C further noted Defendant's failure to report to the Reentry Sanction Center, water loading during a drug test, failure to report to drug testing, and multiple failures to report to CSOSA's employment program. Ominously, CSOSA noted that "Mr. Campbell has continued to fail to engage *in any* interventions and programming," and that "He also failed to begin the Violence Reduction Program." Ex. C at 2 (emphasis added).

On February 2, 2023, Judge Ryan gave Defendant a judicial warning to come into compliance by the next court date. At the next court hearing on February 16, 2023, CSOSA reported that Defendant remained in non-compliance, but Judge Ryan set a further status hearing, again providing Defendant with an opportunity to come into compliance. On April 4, 2023, Defendant was discharged from the Violence Reduction/Anger Management Program. At the April 5, 2023, status hearing, CSOSA advised Judge Ryan of Defendant's continued

16

noncompliance, and Judge Ryan provided Defendant with more time to complete his required program while the defense worked on a plan for Defendant to engage in outpatient drug treatment.

On April 20, 2023, Judge Ryan detained Defendant temporarily to place him in bed-to-bed transfer to a drug treatment program. Defendant entered the program on May 5, 2023, and was discharged just two days later due to substance abuse.

In a May 10, 2023, AVR (hereafter, "Exhibit D"), CSOSA reported that Defendant continuously tested positive for cocaine at least six times, failed to provide a drug testing specimen twelve times, failed to attend the court-ordered Violence Reduction Program classes twelve times, and provided a bogus sample for a drug test. Indeed, the report noted, "there has been no change in Mr. Campbell's adjustment or engagement with EIC programming for prosocial interactions and programming. While Mr. Campbell has attempted to present a positive image, his arrests, criminal history and lack of compliance has shown otherwise. Mr. Campbell's community affiliations, representations through his music/in the community, etc. has raised concerns for community safety, supervision safety and the offender. His drug use, arrest and lack of engagement is evidence of his poor responsivity to community supervision. At this time, he does not appear amenable to sanctions imposed through the community supervision process." Ex. D at 3. Indeed, CSOSA warned that "the offender poses a High Risk for Community Supervision because the Offender's drug use and lack of engagement is unabated. Therefore, this Community Supervision Officer is respectfully requesting an expedited Show Cause Hearing at which time revocation will be recommended." *Id*. at 4.

In fact, the defendant was arrested over the weekend in this case precisely because he did not appear for his court-ordered check-in with CSOSA. Initially, law enforcement had planned to execute the arrest warrant on Friday, May 12, 2023, when the defendant was supposed to appear

17

to be outfitted for GPS after having just been released by Judge Ryan. Yet, predictably, he failed to appear, necessitating the weekend operation in this case.

Combined, Defendant's consistent firearms possession and blatant violations of court-ordered release conditions not only show by clear and convincing evidence that he presents a danger to the community that cannot be mitigated by least restrictive conditions, but it further evinces by a preponderance of the evidence that the defendant presents a flight risk. Moreover, Defendant's pattern of conduct cannot provide the Court with any confidence that Defendant will comply with any imposed conditions of release.

## IV.     Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by Defendant's release, also weighs in favor of detention. Given the number of firearms Defendant has possessed thus far, including those depicted in his phones, the dangerousness that Defendant poses to the community cannot be understated. And as evinced by the NIBIN leads connected to one of his firearms in addition to his own words in the music videos he posts to YouTube, it is reasonable to infer that he is not simply collecting firearms without ever discharging them. That he has persisted in possessing weapons designed to kill and maim, despite himself having been a victim of gun violence, evinces a level of dangerousness that cannot be mitigated by less restrictive conditions or combinations thereof. *See United States v. Gassaway*, No. 21-cv-550, 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) ("This Court agrees with other courts in this district that unlawfully carrying a concealed or loaded firearm in public poses a risk of danger to the public," and collecting cases.).

Further, if released, Defendant will pose a flight risk given his prior noncompliance both with pre-trial release and probationary conditions. In light of all of the above, the Court can have

no confidence that less restrictive conditions will assure the safety of the community and Defendant's return to Court.

                Respectfully submitted,

                MATTHEW M. GRAVES
                UNITED STATES ATTORNEY
                D.C. Bar 481052

By: */s/ Sitara Witanachchi*
    SITARA WITANACHCHI
    ANDY WANG
    Assistant United States Attorneys
    D.C. Bar Number 1023007 (Witanachchi)
    United States Attorney's Office
    601 D Street NW
    Washington, D.C. 20530
    Telephone: (202) 252-2400
    sitara.witanachchi@usdoj.gov