**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CASE NO. 23-CR-161 (CRC)** |
| | : | |
| **RUSSELL CAMPBELL,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**</u>

Defendant seeks dismissal of both counts in the Indictment – charging him in Count One with Unlawful Possession of a Firearm and Ammunition by a Person Pending Indictment, in violation of 18 U.S.C. § 922(n); and in Count Two with Unlawful Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1) – claiming that under "the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Sections 922(g)(1) and 922(n) are an unconstitutional restriction on an individual's Second Amendment right to keep and bear arms, both facially and as applied." *See* Defendant's Motion ("Mot.") at 1. Defendant's claims fail and similar arguments have been rejected by other federal courts, including one recently in this district. *See United States v. Whittaker*, 22-CR-272 (CRC).

<u>**Summary of Facts**</u>

<u>Facts Underlying Count One:  18 U.S.C. § 922(n):</u>

On June 20, 2021, law enforcement recovered at a Mobil Gas Station at 2210 Bladensburg Road NE five firearms, including one on Defendant's person.  At the time, the Defendant was charged by complaint in D.C. Superior Court case number 2020 CF2 8559 with "Carrying a Pistol Without a License".

That day, around 12:30 a.m., at the 2200 b/o Bladensburg Road NE, Washington, D.C. 20018, officers in the vicinity of the Mobil Gas noticed that there was unusual traffic inside the

station, and a security guard was contacting a group of people congregated around a silver Hyundai (MD registration 8EK444).  Officers parked at the station and heard a security guard asking the group whether they were pumping gas, but the group did not provide a response, nor did anyone appear to be pumping gas.  Officers exited their vehicle, and thereupon noticed Defendant's associate attempting to blade his body from officers, manipulating an object in the front of his pants area, and dropping the object into a trash can resulting in a loud metallic "thump" sound. Officers quickly verified that the object was a loaded firearm, so Defendant's associate was placed in handcuffs.

Meanwhile, officers noticed that the Defendant was walking away, and upon being steered back, officers noticed the Defendant adjusting his front waistband area, which rendered visible to surrounding officers a magazine in the Defendant's waistband area.  Upon touching what appeared to be a magazine under the Defendant's shirt and protruding from his waistband, officers confirmed that the Defendant was armed with a firearm on his person.  They seized from the Defendant's waistband area a firearm – a Glock 45 .9mm, serial number BLPU184, with 23 rounds in the magazine, and one in the chamber.

DNA testing on the Glock 45 .9mm, serial number BLPU184 resulted in the following conclusion:  the DNA profile on the firearm is a mixture of three contributors, and Defendant is included.  Specifically, it is 1.5 septillion times more likely if Defendant and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors.  This is very strong support for inclusion.

Facts Underlying Count Two:  18 U.S.C. § 922(g)(1):

On November 10, 2022, law enforcement observed yet another firearm attributable to Defendant.  That evening, law enforcement were surveilling Defendant's associate, Trevor Wright,

aka "Taliban Glizzy,"[1] as he entered St. Yves' nightclub.  He ultimately left the club around 3:00 a.m. in a black Chevrolet Suburban ("Subject Vehicle"), where law enforcement noted that he occupied the passenger's-side captain's chair.  To his left, occupying the driver's-side captain's chair was the Defendant.  Three others occupied the backseat of the Subject Vehicle.

US Secret Service followed the Subject Vehicle when it left the club, and when the Subject Vehicle ran a red light, USSS performed a traffic stop around 3:11 a.m. in front of 810 7th Street, NW.  Officers recovered from Subject Vehicle five different firearms.  Notably here, between Defendant's and Wright's seats was a backpack containing a 5.56 Zastava AK-Style pistol PAP M85PV (bearing S/N M85PV003177), with an extended magazine holding 30 rounds of .556 caliber live rounds, and one in the chamber.[2]

---

[1] Note that Wright is charged by Indictment in case number 22-cr-410 (CRC), with two counts of 18 U.S.C. § 922(g) in connection with the November 11, 2022 incident as well as another incident from earlier that year.

[2] Under the driver's seat was a 9mm Glock 26 (S/N YVH326) with 15 live rounds of 9mm ammunition in the magazine and one in the chamber.  Under Wright's seat were two firearms – a 9mm Glock 19 (S/N ACSZ325) with fifteen live rounds in the magazine and one in the chamber; and a 10 mm Glock 29 (S/N BCNT225), also with fifteen live rounds in the magazine and one in the chamber.  In front of Wright's seat was a 357 Glock 31 (S/N BEXR714) with an extended magazine containing twenty-two live rounds and one round in the chamber.  Wright's DNA is included on the Glock 19.



Surveillance from 268 37th Place SE at approximately 5:30 p.m. shows that Defendant brought this backpack into the car, not Wright or any of the other passengers in the Subject Vehicle, which was further corroborated by the Lyft driver.



DNA testing on the Zastava firearm further corroborated that Defendant possessed it. The DNA profile from the Zastava consists of a mixture of four contributors. It is 32 sextillion times

more likely that Defendant and three unknown, unrelated people are contributors than if four unknown, unrelated individuals are contributors.  That result is very strong support for inclusion. What's more, on the Zastava magazine inserted into the firearm, the DNA profile is a mixture of four contributors, and it is 2.5 million times more likely if the mixture consists of Defendant and three unrelated, unknowns than if it consisted of four unrelated, unknown individuals.  This, too, is very strong support for inclusion.

## ARGUMENT

### I.    *Bruen* Does Not Upend Binding Precedent Affirming the Constitutionality of Section 922(g)(1).

Defendant asserts (at 1–2) that under *Bruen*, § 922(g)(1) violates the Second Amendment. Contrary to defendant's claim, the D.C. Circuit's precedent upholding § 922(g)(1) remains binding on this Court.

### A.    *Bruen* and the Relevant Legal Framework

In *Bruen*, the Supreme Court considered a challenge made by two "law-abiding, adult citizens" to New York's requirement that, to obtain a license to carry a concealed firearm outside the home or place of business for self-defense, one must prove to the licensing officer that "proper cause exists" to issue it. 142 S. Ct. at 2123. "Proper cause" was not defined by statute, but had been interpreted by New York courts to require proof of a "special need for self-protection distinguishable from that of the general community." *Id.* (quotation marks and citation omitted). This was a "demanding" standard. Living or working in a high-crime area was not enough; instead, applicants typically needed "evidence of particular threats, attacks, or other extraordinary danger to personal safety." *Id.* (quotation marks and citations omitted).

The Supreme Court held that New York's "proper cause" requirement violates the Second Amendment. In doing so, the Court noted the then-prevailing two-step test fashioned post-*Heller* by the lower courts, i.e., (1) determining whether the regulated conduct fell within "the original scope of the [Second Amendment] right based on its historical meaning," and if so, (2) engaging in a means-end balancing inquiry whether the challenged regulation could satisfy either strict or intermediate scrutiny, depending on whether the regulation burdened the "core" Second Amendment right. *Bruen*, 142 S. Ct. at 2125–26 (cleaned up). *Bruen* held that

> this two-step approach[ ] is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny [*i.e.*, step two,] in the Second Amendment context.

*Id.* at 2127. *Bruen* explained that it was *applying*, rather than expanding or otherwise altering, the same test set forth in *Heller* to assess Second Amendment claims: "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. *See also id.* (indicating that the Court was "[f]ollowing the course set by *Heller*"). The Court simply made the *Heller* test "more explicit," by clarifying that courts should evaluate firearm laws based only upon a "text and history" inquiry, without conducting an additional interest-balancing, means-end inquiry. *Id.* at 2128–30, 2134.

In applying the text-and-history test, the Supreme Court first concluded that the Second Amendment's text protected conduct governed by New York's "proper cause" requirement. The Court reiterated *Heller's* holding that the text of the Second Amendment protected "'the right of law-abiding, responsible citizens to use arms' for self-defense," *Bruen*, 142 S. Ct. at 2131 (quoting

*Heller*, 554 U.S. at 635). Moreover, the Court held that this right applies outside the home or place of business, such that the "proper cause" licensing requirement infringed upon it. *Id.* at 2134–35.

Second, because the Second Amendment's "text" protected conduct governed by the "proper cause" requirement, the Supreme Court considered whether New York could show that this requirement was "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The Court agreed that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138. Nonetheless, there was not "a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," or of "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* Accordingly, the Court held, "under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.*

### B.    D.C. Circuit Precedent Upholding § 922(g)(1) Remains Good Law.

In *Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019), the D.C. Circuit unequivocally held that pursuant to the Supreme Court's guidance in *Heller*, "a felony conviction [regardless of dangerousness] removes one from the scope of the Second Amendment," and thus a constitutional challenge to § 922(g)(1) fails the *first* step of the then-existing constitutional analysis. Medina, who had been convicted of a nonviolent felony, *i.e.*, making a false statement to a lending institution, in violation of 18 U.S.C. § 1014, claimed that § 922(g)(1) violated the Second Amendment as applied to him, "because he poses no heightened risk of gun violence." *Medina*,

154 F.3d at 154.[3] The D.C. Circuit "reject[ed] this contention," "[b]ecause . . . felons are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* Consistent with the Supreme Court's later guidance in *Bruen*, *Medina* explained that "we must look to tradition and history. . . . The Second Amendment was ratified in 1791, so we look to the public understanding of the right at that time to determine if a convicted felon would fall outside the scope of its protection." *Id.* at 158. The D.C. Circuit carefully surveyed the Founding-era treatment of felonies, under which even nonviolent felonies were punishable by death. *Id.* The court also considered the prevalent Founding-era view that in keeping with the "virtuous citizen" theory, "the right to bear arms does not preclude laws disarming the unvirtuous (i.e., criminals)." *Id.* at 159 (cleaned up). And the court credited the Supreme Court's repeated assurances that felon prohibitions remain lawful after *Heller*. *Id. See also id.* at 155 ("In *Heller*, and again in *McDonald*[ ], the Court explained that the recognition of an individual right to bear firearms does not cast doubt on longstanding prohibitions on the possession of firearms by felons. The practice of barring convicted felons from possessing firearms is a presumptively lawful regulatory measure.") (internal quotation marks and citations omitted); *Wrenn v. District of Columbia*, 864 F.3d 650, 659 (D.C. Cir. 2017) ("the Supreme Court has taught in *Heller*[ ] that legal regulations of possession or carrying that are 'longstanding'—including bans on possession by felons . . . —reflect limits to the preexisting right protected by the [Second] Amendment"). Thus, *Medina* held,

> On balance, the historical evidence and the Supreme Court's discussion of felon
> disarmament laws leads us to reject the argument that non-dangerous felons have a

---

[3] The D.C. Circuit appeared to agree that Medina was not a dangerous person; the court noted that his only other criminal record involved misdemeanor false statements on a Wyoming hunting license application; he "owns a successful business, supports a family, and engages in philanthropy"; and "[h]is rehabilitation has been recognized by several important institutions, including "[e]ven the victim of [his felony] false statement, [a mortgage lender that subsequently] recognized his trustworthiness . . . by extending him a $1,000,000 line of credit." *Medina*, 913 F.3d at 154.

> right to bear arms. As a practical matter, this makes good sense. Using an amorphous "dangerousness" standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons by convicted criminals, illegal aliens, or perhaps even children. We do not think the public, in ratifying the Second Amendment, would have understood the right to be so expansive and limitless. . . . For these reasons, we hold that those convicted of felonies are not among those entitled to possess arms.

*Id.* at 159–60. Accordingly, the court explained, "[b]ecause [Medina's] claim fails at the first step of the [then-prevailing two-step] analysis, we need not reach the second step." *Medina* thus did not predicate its ruling upon the second-step interest-balancing test that was later rejected in *Bruen*.

*Medina* remains binding on this Court. *Medina* relied exclusively on the first-step analysis that *Bruen* reaffirmed as the only correct basis for evaluating a Second Amendment challenge. *See Bruen*, 142 S. Ct. at 2127 ("Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."). Accordingly, *Bruen* did not abrogate *Medina*'s holding, but in fact confirmed it. *Medina* thus controls the outcome here. *See, e.g., United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("Just as we leave to the Supreme Court the prerogative of overruling its decisions, district judges, like panels of this court, are obligated to follow controlling circuit precedent until either we, sitting en banc, or the Supreme Court, overrule it. That a district judge disagrees with circuit precedent does not relieve him of this obligation whether or not the precedent has been embraced by our sister circuits.") (cleaned up).

In addition, the overwhelming majority of federal courts have rejected post-*Bruen* challenges to § 922(g)(1). Indeed, some of those courts have cited *Medina* in support of their analysis. For example, in *United States v. Jackson*, No. 22-2870, 2023 WL 3769242 (8th Cir. June 2, 2023), the Eighth Circuit rejected a nonviolent felon's as-applied *Bruen* challenge to § 922(g)(1), and cited *Medina* in doing so, *see id.* at *6. At the outset, the Eighth Circuit held that

"given the[ ] assurances by the Supreme Court" in *Heller, McDonald*, and *Bruen* that felon-in-possession statutes remain constitutional, "and the history that supports them," there was "no need" to distinguish between violent and nonviolent felonies for Second Amendment purposes. *Id.* at 4. *See also id.* at *6 (drawing same conclusion from the Supreme Court's "repeated characterization of Second Amendment rights as belonging to 'law-abiding' citizens").

Tracking the D.C. Circuit's decision in *Medina*, the *Jackson* court carefully applied the test set forth in *Bruen*, and surveyed the historical record, including pre-colonial English law, colonial American law, the Revolutionary period, and the debates and legislation surrounding the Constitution's ratification. *Jackson* thus noted that many Founding-era legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." 2023 WL 3769242, at *5; *see also id.* at 6 ("As stated by the D.C. Circuit [in *Medina*], 'it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.'") (citing *Medina*, 913 F.3d at 158). *Jackson* thus held that Jackson "is not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for the legal norms of society." *Id.* at *6. *Jackson* further explained that even "if dangerousness is considered the traditional *sine qua non* for dispossession, then [this same] history demonstrates that there is no requirement for an *individualized* determination of dangerousness as to each person in a class of prohibited persons." *Id.* (emphasis added). Thus, whether felon prohibitions "are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1)." *Id.* at *7.

In addition, the Fifth Circuit has rejected two post-*Bruen* challenges to the constitutionality of § 922(g)(1) on plain-error review. *See United States v. Roy*, No. 22-10677, 2023 WL 3073266, *1 (5th Cir. Apr. 25, 2023); *United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, *1 (April 25, 2023). The Seventh Circuit has also held that an as-applied *Bruen* challenge to § 922(g)(1) by violent felons would be "frivolous." *United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) ("the [Supreme Court has] declined to question laws requiring background checks or barring felons from possessing firearms[,] . . . and we are aware of no authority supporting an argument that [violent felons] historically had the right to possess a gun. Thus, it would be frivolous to argue that § 922(g)(1) is unconstitutional as applied to [them].").[4]

---

[4] In addition, district courts across the country, including two in this district, have consistently rejected claims that § 922(g)(1) violates the Second Amendment under *Bruen*. *See United States v. Tatum*, 22-cr-120-DLF (D.D.C. Mar. 22, 2023); *United States v. Whittaker*, 22-cr-272-CRC, Dkt. No. 33 (D.D.C. Jan. 12, 2023); *see also United States v. Meyer*, No. 22-cr-10012, Dkt. No. 53 (S.D. Fl. May 9, 2023); *United States v. Carter*, No. 22-cr-20477, Dkt. No. 51 (E.D. Mi. May 9, 2023); *United States v. Bluer*, No. 22-cr-20557, Dkt. No. 27 (E.D. Mich. May 8, 2023); *United States v. Hazley*, No. 22-cr-20612, Dkt. No. 32 (E.D. Mich. May 5, 2023); *United States v. Murphy*, No. 22-cr-121, Dkt. No. 42 (N.D. Ill. May 3, 2023); *United States v. Thompson*, No. 22-cr-173, Dkt. No. 53 (E.D. La. Apr. 7, 2023); *United States v. Taylor*, No. 22-cr-20315, Dkt. No. 36 (E.D. Mich. Apr. 26, 2023); *United States v. McIlwain*, No. 2:23-cr-20012, Dkt. No. 28 (E.D. Mich. Apr. 26, 2023); *United States v. Thomas*, No. 2:23-cr-20036, Dkt. No. 27 (E.D. Mich. Apr. 25, 2023); *United States v. Cummings*, No. 1:22-cr-51, Dkt. No. 49 (N.D. Ind. Apr. 20, 2023); *United States v. Payne*, No. 4:22-cr-173, Dkt. No. 24 (S.D. Tex. Apr. 12, 2023); *United States v. Guthery*, No. 2:22-cr-173, Dkt. No. 49 (E.D. Cal. Mar. 29, 2023); *United States v. Finney*, No. 2:23-cr-13, Dkt. No. 23 (E.D. Va. Mar. 29, 2023); *United States v. Dixon*, No. 1:22-cr-140, Dkt. No. 76 (N.D. Ill. Mar. 28, 2023); *United States v. Pena*, No. 2:22-cr-366, Dkt. No. 95 (C.D. Cal. Mar. 21, 2023); *United States v. Hoeft*, No. 4:21-cr-40163, Dkt. No. 103 (D. S.D. Mar. 21, 2023); *United States v. Rice*, No. 3:22-cr-36, Dkt. No. 40 (N.D. Ind. Mar. 17, 2023); *United States v. Davis*, No. 1:21-cr-206, Dkt. No. 86 (E.D. Cal. Mar. 14, 2023); *United States v. Kilgore*, No. 1:21-cr-277, Dkt. No. 40 (E.D. Cal. Mar. 14, 2023); *United States v. Lindsey*, No. 4:22-cr-138, Dkt. No. 25 (S.D. Iowa Mar. 10, 2023); *United States v. Tribble*, No. 2:22-cr-85, Dkt. No. 48 (N.D. Ind. Mar. 10, 2023); *Leonard v. United States*, No. 1:22-cv-22670, Dkt. No. 15 (S.D. Fla. Mar. 10, 2023); *United States v. Therrien*, No. 1:21-cr-10323 (D. Mass. Mar. 6, 2023); *United States v. Price*, No. 1:19-cr-824, Dkt. No. 105 (N.D. Ill. Mar. 3, 2023); *United States v. Belin*, No. 1:21-cr-10040, Dkt. No. 65 (D. Mass. Mar. 2, 2023); *United States v. Clark*, No. 1:20-cr-49, Dkt. No. 61 (N.D. Ind. Mar. 2, 2023); *United States v. Braster*, No. 1:20-cr-66, Dkt. No. 42 (N.D. Ind. Mar. 2, 2023); *United States v.*

(continued . . . )

*Barnes*, No. 1:22-cr-43, Dkt. No. 42 (S.D.N.Y. Feb. 28, 2023); *United States v. Beard*, No. 4:22-cr-92, Dkt. No. 58 (S.D. Tex. Feb. 27, 2023); *United States v. Smith*, No. 2:22-cr-20351, Dkt. No. 35 (E.D. Mich. Feb. 24, 2023); *United States v. Barber*, No. 3:22-cr-65, Dkt. No. 58 (D. Ak. Feb. 21, 2023); *United States v. Ross*, No. 2:22-cr-20049, Dkt. No. 34 (E.D. Mich. Feb. 15, 2023); *United States v. Price*, No. 1:21-cr-164, Dkt. No. 122 (N.D. Ill. Feb. 13, 2023); *United States v. Gleaves*, No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023); *United States v. Bacchus*, No. 2:22-cr-450, Dkt. No. 120 (C.D. Cal. Feb. 2, 2023); *United States v. Isaac*, No. 5:22-cr-117, Dkt. No. 27, 2023 WL 1415597 (N.D. Ala. Jan. 31, 2023); *United States v. Taylor*, No. 3:22-cr-22, Dkt. No. 32 2023, WL 1423725 (E.D. Ky. Jan. 31, 2023); *United States v. Barber*, No. 4:20-cr-384, Dkt. No. 118, 2023 WL 1073667 (E.D. Tex. Jan. 27, 2023); *United States v. Hester*, No. 1:22-cr-20333, Dkt. No. 39 (S.D. Fla. Jan. 27, 2023); *United States v. Brown*, No. 2:20-cr-260, Dkt. No. 186, 2023 WL 424260 (E.D. Pa. Jan. 26, 2023); *United States v. Rush*, No. 4:22-cr-40008, Dkt. No. 46, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023); *Davis v. United States*, No. 5:22-cv-224, Dkt. No. 1, 2023 WL 373172 (E.D. Ky. Jan. 24, 2023); *Battles v. United States*, No. 4:23-cv-63, Dkt. No. 2, 2023 WL 346002 (E.D. Mo. Jan. 20, 2023); *United States v. Gordon*, No. 1:14-cr-312, Dkt. No. 170, 2023 WL 336137 (N.D. Ga. Jan. 20, 2023); *Shipley v. Hijar*, No. 3:23-cv-11, Dkt. No. 3, 2023 WL 353994 (W.D. Tex. Jan. 20, 2023); *United States v. Smith*, No. 2:19-cr-505, Dkt. No. 183 (C.D. Cal. Jan. 19, 2023); *United States v. Serrano*, No. 3:21-cr-1590, Dkt. No. 65 (S.D. Cal. Jan. 17, 2023); *United States v. Tucker*, No. 2:22-cr-17, Dkt. No. 30, 2023 WL 205300 (S.D. W. Va. Jan. 17, 2023); *United States v. Robinson*, No. 4:22-cr-70, Dkt. No. 39, 2023 WL 214163 (W.D. Mo. Jan. 17, 2023); *United States v. Whittaker*, No. 1:22-cr-272, Dkt. No. 33 (D.D.C. Jan. 12, 2023); *United States v. Spencer*, No. 2:22-cr-561, Dkt. No. 24 (S.D. Tex. Jan. 12, 2023); *United States v. Garrett*, No. 1:18-cr-880, Dkt. No. 144 (N.D. Ill. Jan. 11, 2023); *United States v. Moore*, No. 3:20-cr-474, Dkt. No. 100, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United States v. Jordan*, No. 3:22-cr-1140, Dkt. No. 39, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023); *Campiti v. Garland*, No. 3:22-cv-177, Dkt. No. 27 (D. Conn. Jan. 10, 2023); *United States v. Coleman*, No. 3:22-cr-8, Dkt. No. 117, 2023 WL 122401 (N.D. W.Va. Jan. 6, 2023); *United States v. Medrano*, No. 3:21-cr-39, Dkt. No. 65, 2023 WL 122650 (N.D. W.Va. Jan. 6, 2023); *United States v. Olson*, No. 1:22-cr-20525, Dkt. No. 33 (S.D. Fla. Jan. 5, 2023); *United States v. Good*, No. 1:21-cr-180, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022), report and recommendation adopted, 2023 WL 25725 (W.D. Mo. Jan. 3, 2023); *United States v. Wondra*, No. 1:22-cr-99, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States v. Jones*, No. 5:22-cr-376, Dkt. No. 59 (W.D. Okla. Dec. 23, 2022); *United States v. Williams*, No. 1:21-cr-362, 2022 WL 17852517 (N.D. Ga. Dec. 22, 2022); *United States v. Dawson*, No. 3:21-cr-293, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022); *United States v. Goins*, No. 5:22-cr-91, Dkt. No. 32 (E.D. Ky. Dec. 21, 2022); *United States v. Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19, 2022); *United States v. Roux*, No. 1:22-cr-19 (D. N.H. Dec. 16, 2022); *United States v. Hunter*, No. 1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022); *United States v. Spencer*, No. 2:22-cr-106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022); *United States v. Dotson*, No. 3:22-cr-1502, Dkt. No. 26 (S.D. Cal. Dec. 12, 2022); *United States v. Tran*, No. 3:22-cr-331, Dkt. No. 63 (S.D. Cal. Dec. 12, 2022); *United States v. Fencl*, No. 3:21-cr-3101, Dkt. No. 81 (S.D. Cal. Dec. 7, 2022); *United States v. Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022); *United States v. Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022); *United States v. Grinage*, No. 5:21-cr-399, Dkt. No. 51, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022); *United States v. Wagoner*, No. 4:20-cr-18, Dkt. No. 262,

(continued . . . )

2022 WL 17418000 (W.D. Va. Dec. 5, 2022); *United States v. Gay*, No. 4:20-cr-40026, Dkt. No. 412 (C.D. Ill. Dec. 5, 2022); *Shelby-Journey-Egnis v. United States*, No. 2:21-cr-20535, Dkt. No. 53 (E.D. Mich. Dec. 5, 2022); *United States v. Glaze*, No. 5:22-cr-425, Dkt. No. 23 (W.D. Okla. Dec. 1, 2022); *United States v. Ford*, No. 4:21-cr-179, Dkt. No. 52, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022); *United States v. Jones*, No. 4:20-cr-354, Dkt. No. 78, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022); *United States v. Jacobs*, No. 2:22-cr-160, Dkt. No. 28 (C.D. Cal. Nov. 28, 2022); *United States v. Cage*, No. 3:21-cr-68, Dkt. No. 41, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022); *United States v. Willis*, No. 1:22-cr-186, Dkt. No. 36 (D. Colo. Nov. 23, 2022); *United States v. Teerlink*, No. 2:22-cr-24, Dkt. No. 33, 2022 WL 17093425 (D. Utah Nov. 21, 2022); *United States v. Brunson*, No. 3:22-cr-149, Dkt. No. 66 (S.D. Cal. Nov. 18, 2022); *United States v. Hill*, No. 4:22-cr-249, Dkt. No. 42 (S.D. Tex. Nov. 17, 2022); *United States v. Blackburn*, No. 1:22-cr-209, Dkt. No. 28 (M.D. Pa. Nov. 17, 2022); *United States v. Mitchell*, No. 1:22-cr-111, Dkt. No. 43 (S.D. Ala. Nov. 17, 2022); *United States v. Dumont*, No. 1:22-cr-53 (D. N.H. Nov. 14, 2022); *United States v. Baker*, No. 2:20-cr-301, Dkt. No. 179, 2022 WL 16855423 (D. Utah Nov. 10, 2022); *United States v. Carpenter*, No. 1:21-cr-86, Dkt. No. 38, 2022 WL 16855533 (D. Utah Nov. 10, 2022); *United States v. Gray*, No. 1:22-cr-247, Dkt. No. 22, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States v. Moore*, No. 2:21-cr-121, Dkt. No. 81 (W.D. Pa. Nov. 9, 2022); *United States v. Reese*, No. 2:19-cr-257, Dkt. No. 193 (W.D. Pa. Nov. 8, 2022); *United States v. Young*, No. 2:22-cr-54, Dkt. No. 47 (W.D. Pa. Nov. 7, 2022); *United States v. Butts*, No. 9:22-cr-33, Dkt. No. 33 (D. Mont. Oct. 31, 2022); *United States v. Burton*, No. 3:22-cr-362, Dkt. No. 48 (D. S.C. Oct. 28, 2022); *United States v. Carleson*, No. 3:22-cr-32, Dkt. No. 39 (D. Ak. Oct. 28, 2022); *United States v. Grant*, No. 3:22-cr-161, Dkt. No. 44, 2022 WL 16541138 (D. S.C. Oct. 28, 2022); *Walker v. United States*, No. 3:20-cv-31, Dkt. No. 16, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022); *United States v. Law*, No. 2:20-cr-341, Dkt. No. 60 (W.D. Pa. Oct. 27, 2022); *United States v. Borne*, No. 1:22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022); *United States v. Minter*, No. 3:22-cr-135, Dkt. No. 33 (M.D. Pa. Oct. 18, 2022); *United States v. Melendrez-Machado*, No. 3:22-cr-634, Dkt. No. 32, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022); *United States v. Raheem*, No. 3:20-cr-61, Dkt. No. 389, 2022 WL 10177684 (W.D. Ky. Oct. 17, 2022); *United States v. Ridgeway*, No. 3:22-cr-175, Dkt. No. 32, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States v. Trinidad*, No. 3:21-cr-398, Dkt. No. 99, 2022 WL 10067519 (D.P.R. Oct. 17, 2022); *United States v. Carrero*, No. 2:22-cr-30, Dkt. No. 50, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Ortiz*, No. 3:21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022); *United States v. Riley*, No. 1:22-cr-163, Dkt. No. 37, 2022 WL 7610264 (E.D. Va. Oct. 13, 2022); *United States v. Price*, No. 2:22-cr-97, 2022 WL 6968457, at *6-9 (S.D. W.Va. Oct. 12, 2022); *United States v. King*, No. 7:21-cr-255, Dkt. No. 50, 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022); *United States v. Daniels*, No. 1:03-cr-83, Dkt. No. 69, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 7:22-cr-154, Dkt. No. 48, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Williams*, No. 3:21-cr-478, Dkt. No. 76 (S.D. Cal. Sept. 30, 2022); *United States v. Harper*, No. 5:21-cr-4085, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022), report and recommendation adopted, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Campbell*, No. 5:22-cr-138, Dkt. No. 64 (W.D. Okla. Sept. 27, 2022); *United States v. Siddoway*, No. 1:21-cr-205, Dkt. No. 54, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Perez*, No. 3:21-cr-508, Dkt. No. 78 (S.D. Cal. Sept. 26, 2022); *United States v. Collette*, No. 7:22-cr-141, Dkt. No. 66, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Delpriore*, No.

(continued . . . )

And as discussed *infra*, the Third Circuit's contrary ruling in *Range v. Att'y Gen.*, No. 21-2835, 2023 WL 3833404 (3d Cir. June 6, 2023) (en banc) (issuing a "narrow" ruling that § 922(g)(1) is unconstitutional as applied a defendant who, in 1995, had pled guilty to a Pennsylvania misdemeanor (punishable by five years' imprisonment) of making a false statement to obtain food stamps, as "he and his wife struggled to raise three young children on $300 per week"; had "accepted full responsibility for the misrepresentation; had successfully completed his probationary sentence; and had no other criminal history beyond minor traffic and regulatory infractions), is neither binding nor persuasive.

## II.    Section 922(g)(1) Would Survive Renewed Scrutiny After *Bruen* in Any Event.

Even if this Court were inclined to take a fresh look at § 922(g)(1) in light of *Bruen's* analytical framework, defendant's Second Amendment challenge would fail. "State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially

---

3:18-cr-136, Dkt. No. 287 (D. Ak. Sept. 23, 2022); *United States v. Coombes*, No. 4:22-cr-189, Dkt. No. 39, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 3:21-cr-107, Dkt. No. 70, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 3:21-cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Cockerham*, No. 5:21-cr-6, Dkt. No. 31 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. 0:21-cr-51, Dkt. No. 114, 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Havins*, No. 3:21-cr-1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Doty*, No. 5:21-cr-21, Dkt. No. 34 (N.D. W.Va. Sept. 9, 2022); *United States v. Burrell*, No. 3:21-cr-20395, Dkt. No. 34, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022); *United States v. Randle*, No. 3:22-cr-20, Dkt. No. 34 (S.D. Miss. Sept. 6, 2022); *United States v. Ingram*, No. 0:18-cr-557, Dkt. No. 1714, 2022 WL 3691350 (D. S.C. Aug. 25, 2022); *United States v. Nevens*, No. 2:19-cr-774, Dkt. No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Farris*, No. 1:22-cr-149, Dkt. No. 29 (D. Colo. Aug. 12, 2022); *United States v. Adams*, No. 1:20-cr-628 (S.D.N.Y. Aug. 10, 2022); *United States v. Ramos*, No. 2:21-cr-395, Dkt. No. 31 (C.D. Cal. Aug. 5, 2022); *United States v. Doss*, No. 4:21-cr-74, Dkt. No. 126 (S.D. Iowa Aug. 2, 2022); *United States v. Maurice*, No. 7:22-cr-48 (S.D.N.Y. Jul. 14, 2022). *But see United States v. Bullock*, No. 3:18-cr-165 2023 WL 4232309 (S.D. Miss. June 28, 2023) (finding that § 922(g)(1) violates Second Amendment as applied to defendant).

declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944). Facial attacks on the constitutionality of a statute rarely succeed, because the challenger must establish that "no set of circumstances exists under which the [a]ct would be valid, i.e., that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks and citation omitted). Here, defendant bears the burden to show that § 922(g)(1) infringes upon the Second Amendment right of *law-abiding* citizens to bear arms in self-defense.[5] Only then does "the burden fall[] on [the government] to show that [the challenged regulation] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135.

Contrary to defendant's claim, the Supreme Court emphasized in *Heller*, reiterated in *McDonald v. Chicago*, 561 U.S. 742 (2010), and confirmed yet again in *Bruen* that these rulings, and more specifically the manner of analysis that they require, do not call into question the constitutionality of laws that prohibit felons from possessing firearms. Accordingly, § 922(g)(1) is facially constitutional. And because, as a felon, defendant was lawfully prohibited from possessing a firearm, the statute is constitutional as applied to him.

---

[5] In explaining the proper Second Amendment analysis, *Bruen* analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id*. at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). Under the First Amendment's burden-shifting framework, the party challenging a regulation has the burden to show that the challenged provision implicates the First Amendment right, after which the government bears the burden to justify the purported restriction on the freedom of speech. "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

### A.    The Plain Text of the Second Amendment Does Not Protect Felons.

Defendant's facial challenge to § 922(g)(1) fails at the outset. As *Bruen* held, courts must determine "whether the plain text of the Second Amendment protects [the] proposed course of conduct," and only then will "the burden fall[] on [the government] to show that [the challenged regulation] is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. Here, defendant fails to show that the Second Amendment's guarantee applies to convicted felons.

The Second Amendment protects "the right of the people to keep and bear arms." U.S. Const. amend. II. In *Bruen,* it was "undisputed" that the respondents were "ordinary, law-abiding" people whose right to keep and bear arms is protected by the Second Amendment. 142 S. Ct. at 2134. Here, by contrast, as a felon, defendant has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his right to possess firearms. He cannot clear this hurdle.

To the contrary, in *Heller*, the Supreme Court emphasized that felons do not have a Second Amendment right to possess firearms. *See Heller*, 554 U.S. at 626-27 ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.").[6] In *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" its "assurances"

---

[6] *See, e.g., United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("The *Heller* Court reached the Second Amendment's connection to law-abiding citizens through a historical analysis, independent of its discussion about who constitutes 'the people.'"). *See also* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 413 (2009) ("*Heller* categorically excludes certain types of 'people' and 'Arms' from Second Amendment coverage, denying them any constitutional protection whatsoever.").

that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Court confirmed yet again that the right to keep and bear arms belongs only to "law-abiding, responsible" persons. 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635); *see also id.* at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. And three of the Justices in the majority reiterated that point in concurrences. *See id.* at 2157 (Alito, J., concurring) ("all we decide" is that "a state may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for [self-defense]"; *Bruen* "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly understood, the Second Amendment allows a 'variety' of gun regulations," including "'prohibitions on the possession of firearms by felons'") (quoting *Heller*, 554 U.S. at 626–27, 636). By definition, prohibiting felons from possessing firearms, which ensures that "those bearing arms" are "law-abiding, responsible citizens," accords with the Second Amendment. *Id.* (quoting *Heller*, 554 U.S. at 635).

Consistent with the understanding that the Second Amendment protects the rights of law-abiding, responsible citizens, *Bruen* approved "'shall-issue' licensing regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2139 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[.]"). In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. "Shall-issue" licensing regimes generally pass constitutional muster because "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* at 2139 n.9. Instead, they "are designed to ensure only that those

bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *See id.* at 2139 n.9. This reasoning underscores that § 922(g)(1)—which directly aims to ensure that "those bearing arms" are "law-abiding, responsible citizens"—accords with the Second Amendment. *See id.*

In keeping with the Supreme Court's guidance as to the scope of the Second Amendment, several federal circuits have recognized that a conviction for any "crime punishable by imprisonment for a term exceeding one year" necessarily excludes the perpetrator from the class of "law-abiding, responsible" citizens protected by the Second Amendment. In addition to *Medina* and *Jackson, see, e.g., United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("reaffirm[ing]" the Fifth Circuit's pre-*Heller* jurisprudence holding "that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate" the Second Amendment (citing *United States v. Emerson*, 270 F.3d 203, 260-61 (5th Cir. 2001))).

Any attempt to dismiss *Heller*'s discussion of felons as dicta is foreclosed by D.C. Circuit precedent in *Medina* and *Wrenn*. As discussed *supra*, both cases relied on this language from *Heller* as delineating the scope of the Second Amendment as to felons. *Medina*, 913 F.3d at 155; *Wrenn*, 864 F.3d at 659. *Heller*, *McDonald*, and *Bruen* directly addressed the scope of the right protected by the Second Amendment, and in doing so clarified what persons were and were not covered by the Second Amendment. As *Bruen* explained, in *Heller*, "[a]fter holding that the Second Amendment protected an individual right to armed self-defense, *we also relied on the historical understanding of the Amendment to demark the* limits on the exercise of that right." 142 S. Ct. at 2128 (emphasis added). *See also Rozier*, 598 F.3d at 771 n.6 ("to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by law-abiding and qualified individuals, it is not dicta") (emphasis in original).

Nor has *Heller*'s discussion been superseded by *Bruen*'s explanation of the appropriate test for evaluating Second Amendment claims. Instead, *Bruen* purported to "*apply*" "[t]he test that we set forth in *Heller*," not revise it. 142 S. Ct. at 2131 (emphasis added). If *Bruen*'s effect were to disallow prohibitions as to felons that *Heller* had expressly authorized, one would expect the Court to have acknowledged this change. But as discussed *supra*, the *Bruen* majority, just as it did in *Heller*, repeatedly defined the Second Amendment as protecting the rights of "law-abiding, responsible" persons, and reiterated, rather than revised, *Heller*'s analytical framework, including its recognition of "limits on the exercise of that right." 142 S. Ct. at 2128, 2133–34. And as the *Bruen* concurrences expressly endorsed, and as *Medina* held, felons are outside the scope of the Second Amendment entirely. Accordingly, the defendant cannot establish that § 922(g)(1) violates the Second Amendment.

The Third Circuit's contrary ruling in *Range* does not support abandoning the overwhelming weight of post-*Bruen* authority upholding § 922(g)(1). In *Range*, the court issued a "narrow" ruling on an as-applied challenge to § 922(g)(1) by a defendant who, in 1995, had pleaded guilty to a Pennsylvania misdemeanor of making a false statement to obtain food stamps. 2023 WL 383304, at *8. Because this misdemeanor was punishable by up to five years' imprisonment, it disqualified him from possessing a firearm under § 922(g)(1). *See* 18 U.S.C. § 921(a)(20)(B) (excluding only those State offenses "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less").

First, the court held that Range was among "the people" protected by the Second Amendment despite his conviction. *Id.* at *3–5. *Range* noted the Supreme Court's consistent emphasis on "law-abiding, responsible citizens," and conceded that "[i]n isolation, this language seems to support the Government's argument." *Id.* at *3–4. Nonetheless, contrary to *Medina* and

departing from its own prior holdings,[7] the Third Circuit dismissed this language as "dicta" because "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases." *Id.* at \*4. As discussed supra, the Supreme Court's repeated assurances about felon prohibitions are not dicta. But even if they were, courts "routinely afford substantial, if not controlling deference to dicta from the Supreme Court." *Hengle v. Treppa*, 19 F. 4th 324, 347 (4th Cir. 2021) (cleaned up). Contrary to *Range*'s approach, courts "cannot simply override a legal pronouncement endorsed . . . by a majority of the Supreme Court, particularly when the supposed dicta is recent and not enfeebled by later statements." *Id.* (cleaned up). Here, far from "enfeebling" *Heller*'s recent assurances about felons, the Supreme Court has reiterated those assurances (and thus validated the holdings of post-*Heller* cases relying upon them) at every opportunity, particularly in *McDonald* and in *Bruen*.

---

[7] The Third Circuit had previously held that the Supreme Court's language regarding felons was *not* dicta:

> We agree with the Second and Ninth Circuits that *Heller*'s list of "presumptively lawful" regulations [including the prohibition of possession by felons] is not dicta. As we understand *Heller*, its instruction to the District of Columbia to "permit [Heller] to register his handgun [and to] issue him a license to carry it in the home," was not unconditional. *See Heller*, 554 U.S. at 647[ ]. Rather, it was made expressly contingent upon a determination that Heller was not "disqualified from the exercise of Second Amendment rights." *Id.* The District of Columbia could comply with the Supreme Court's holding either: (1) by finding that Heller was "disqualified from the exercise of Second Amendment rights" under a "presumptively lawful" regulation (such as a felon dispossession statute); or (2) by registering Heller's handgun and allowing him to keep it operable in his home. *Id.* Accordingly, the Supreme Court's discussion in *Heller* of the categorical exceptions to the Second Amendment was not abstract and hypothetical; it was outcome-determinative. As such, we are bound by it.

*United States v. Barton*, 633 F.3d 168, 171–72 (3d Cir. 2011) (citing cases), *overruled on other grounds by Binderup v. Att'y Gen. of the United States*, 836 F.3d 336 (3d Cir. 2016).

*Range* also complained that "the [Supreme Court's] phrase 'law-abiding, responsible citizens' is as expansive as it is vague," and might be abused by legislatures to "decide whom to exclude from 'the people'" by improperly "manipulat[ing] the Second Amendment by choosing a [felony] label" for minor crimes. *Id.* (cleaned up). But in *Bruen* itself, the Supreme Court did not view the possibility of abuse as precluding a permitting system that focused on whether a person was law abiding. Instead, the court emphasized, systems without a "good cause" requirement were permissible *because* "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9. *Bruen* recognized that "any permitting scheme can be put toward abusive ends," but explained that such abuses could be addressed through constitutional challenges to the particular state action. *Id.* Accordingly, *Range* is out of step with *Bruen* as to the scope of the Second Amendment.

### B. This Nation's History and Traditions Support Prohibitions Against Felons Possessing Firearms.

Even if the Supreme Court had not already defined the Second Amendment in a way that excludes felons, a review of "this Nation's historical tradition of firearm regulation" would compel the same conclusion. *Bruen*, 142 S. Ct. at 2126. As *Jackson* recognized, "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people." 2023 WL 3769242, at *4. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds* by *Bruen*, 142 S. Ct. 2111. Those regulations "included safety laws . . . disarming certain groups and restricting sales to certain groups." *Id.* "For example, several jurisdictions passed laws that

confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina*, 913 F.3d at 159 (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"). *See generally* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) ("there is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms") (internal citations and footnotes omitted). Section 922(g)(1) fits comfortably within the Nation's longstanding tradition of disarming unvirtuous or dangerous citizens.[8]

"Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *United States v. Carter*, 669 F.3d 411, 415 (4th

---

[8] Justice Breyer's dissent in *Bruen* asserted that "'prohibitions on the possession of firearms by felons . . . have their origins in the 20th century," and "Founding-era legislatures did not strip felons of their rights to bear arms simply because of their status as felons." *Id.* at 2189 (Breyer, J., dissenting) (citations omitted). But a dissenting opinion lacks the power to delimit the impact of the majority's analysis, *see, e.g., Strange on Behalf of Strange v. Islamic Republic of Iran, Interest Section*, 964 F.3d 1190, 1197 (D.C. Cir. 2020) (a dissenting opinion is not precedent even as to questions unaddressed by majority, "because it does not tell us how a majority of the Court would decide the question") (quotation marks and citation omitted). Moreover, it does not matter whether felon-in-possession statutes are "of mid-20th century vintage." *See Nat'l Rifle*, 700 F.3d at 196, *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. *Heller*'s point in endorsing felon-in-possession laws, consistent with *Bruen*, was not that they had existed in their modern form since the Founding but that they were sufficiently analogous to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. *See also Bruen*, 142 S. Ct. at 2134 (approving "longstanding" laws prohibiting possession of firearms in "sensitive places"; "Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.").

Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Indeed, "historical evidence support[s] the notion that government could disarm individuals who are not law-abiding members of the political community," such as convicted felons. *See United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012). "*Heller* identified . . . as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604). That report recognized the permissibility of imposing a firearms disability on convicted felons, stating that "citizens have a personal right to bear arms '*unless for crimes committed, or real danger of public injury.*'" *Id.* (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)) (emphasis added).

For centuries, the gun rights of certain groups have been categorically limited to promote public safety. *Heller* identified the right protected by the 1689 English Bill of Rights as "the predecessor of our Second Amendment." 554 U.S. at 593. That document provided: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous. *See Carpio-Leon*, 701 F.3d at 980. Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868). The Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws

disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue, Law & Contemp. Probs.*, Winter 1986 at 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwartz, *The Bill of Rights* 674–75, 681 (emphasis added). In the same vein, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640.

Nor did the historical disqualification turn on whether the prior felony was considered a violent one. To the contrary, at the Founding, even nonviolent crimes involving mere deception, including forgery, embezzlement, and counterfeiting, were often classified as felonies punishable not just by disarmament, but by death. The First Congress treated "forgery, [dealing in] forged securities, [and] counterfeiting" as capital crimes, *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 905 (3d Cir. 2020) (first alteration in original) (quoting John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56-57 (2012)); several states, including New York and Maryland, subjected forgers to the death penalty;[9] and

---

[9] See Thomas Herty, *A Digest of the Laws of Maryland* 255-56 (1799) (forgery punishable by "death as a felon, without benefit of clergy"); 2 *Laws of the State of New York* 74 (1791) (an

(continued . . . )

contemporary English law similarly categorized "counterfeiting" and "embezzlement" as punishable by execution, *Medina*, 913 F.3d at 158 (quotation marks omitted). "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Id.*

Courts relying on this "'virtuous citizen' theory" have upheld "modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159. In *National Rifle*, the Fifth Circuit rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at 204. The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *Id.* at 203; *see also Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to 18 U.S.C. § 922(x), which restricts the ability of people under 18 to possess handguns). *See also Bruen*, 142 S. Ct. at 2134 (noting that petitioners are "ordinary, law-abiding, *adult* citizens") (emphasis added).[10]

---

individual convicted of forgery "shall be hanged by the neck until he . . . shall be dead"); *see also* 1 *The Laws of the Commonwealth of Massachusetts* 250, § 5 (1807) (forgery of bank bills may be punishable by death).

[10] *Bruen* abrogated *National Rifle* to the extent that *National Rifle* held that a gun regulation could survive a Second Amendment challenge under means-end scrutiny, even if inconsistent with the nation's historical tradition of gun regulations, and to the extent that it upheld §§ 922(b)(1) and (c)(1) under the means-end step of the analysis. *See* 142 S. Ct. at 2127 n.4. But the Fifth Circuit was "inclined to uphold the challenged federal laws *at step one* of our analytical framework," *see Nat'l Rifle*, 700 F.3d at 204 (emphasis added), which relied on the historical record and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates the Fifth Circuit's or other courts' historical analyses, which were typically considered part of "step one" of courts' pre-*Bruen* Second Amendment tests.

Courts have reasoned similarly in upholding other categorical restrictions similar to, but not included in, *Heller*'s non-exhaustive list of presumptively lawful regulations. *See, e.g., United States v. Portillo-Munoz*, 643 F.3d 437, 439–40 (5th Cir. 2011) (holding that § 922(g)(5)'s prohibition of gun possession by illegal aliens does not violate the Second Amendment); *United States v. Yancey*, 621 F.3d 681, 684–87 (7th Cir. 2010) (same); *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("Prohibiting unlawful drug users from possessing firearms is not inconsistent with the right to bear arms guaranteed by the Second Amendment."); *see also United States v. Costianes*, 2023 WL 3550972 (D. Md. May 18, 2023) ("join[ing] the majority of [district] courts that have held [18 U.S.C.] § 922(g)(3) [prohibiting gun possession by unlawful drug users] constitutional in the wake of *Bruen*" (citing cases).

Disqualifying felons from possessing firearms is analogous to civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including the right to vote, *see Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), and the right to serve on a jury, 28 U.S.C. § 1865(b)(5). Just as Congress and the States have required persons convicted of felonies to forfeit certain civic rights, § 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring). Statutes disarming persons considered a risk to society, such as convicted felons, are well known to the American legal tradition. Section 922(g)(1) is consistent with that longstanding tradition.

Here again, *Range* errs in its analysis of the relevant history. *Range* "narrow[ly]" held that the government had failed to sufficiently analogize historically disarmed groups to "Range and his individual circumstances." 2023 WL 3833404, at *6. The Third Circuit reasoned that although Founding-era governments routinely punished nonviolent felons with death and estate forfeiture, this did not permit them to disarm them. But as noted *supra*, in *Medina,* the D.C. Circuit recognized that it did. 913 F.3d at 158. *Range* acknowledged that *Medina* and other circuit cases supporting the government's historical analysis seemed "impressive . . . at first blush," but nonetheless declared that they "fail[ed] to persuade," because they were decided before *Bruen*. 2023 WL 3833404, at *8. But *Range* failed to consider that *Medina* upheld § 922(g)(1) based solely on the first-step text-and-history approach that *Bruen* endorsed, and not the means-end balancing that *Bruen* disallowed. The D.C. Circuit's holding in *Medina* remains binding on this Court, as *Range* itself acknowledged. *See* 2023 WL 3833404, at *7 (disregarding more than 80 post-*Bruen* district court cases upholding § 922(g)(1), because "the district courts are bound to follow their circuits' [pre-*Bruen*] precedent." And even if it were not, the overwhelming weight of pre- and post-*Bruen* cases remain persuasive authority that felons are outside the scope of the Second Amendment, and that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.

### III.    18 U.S.C. § 922(n) is Consistent With the Second Amendment's Text, and With the Nation's Historical Tradition of Firearm Regulation.

In his Motion to Dismiss, defendant seeks dismissal of the count charging a violation of 18 U.S.C. § 922(n), which prohibits shipping, transporting, or receiving a firearm by "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year[.]" This claim is meritless.

The D.C. Circuit has not ruled on the constitutionality of § 922(n) under the Second Amendment. However, post-*Bruen*, two Circuits have upheld § 922(n) on plain-error review. *See*

*United States v. Rodriguez*, No. 22-10896, 2023 WL 4044409 (5th Cir. June 16, 2023); *United States v. Voelz*, 66 F.4th 1155 (8th Cir. 2023). And while finding it unnecessary to decide the question, the Seventh Circuit found it unlikely that § 922(n) "would be held invalid across the board." *United States v. Holden*, 70 F.4th 1015, 1017–18 (7th Cir. 2023). Instead, *Holden* explained,

> Governments may keep firearms out of the hands of dangerous people who are apt to misuse them. *Bruen*, 142 S. Ct. at 2131 (Second Amendment protects "law-abiding, responsible citizens"), 2148–50 (discussing surety laws), 2162 (Kavanaugh, J., concurring). Even if some applications of § 922(n) would flunk the constitutional standard (say, someone under indictment for an antitrust offense), others might illustrate the sort of person who cannot be trusted with guns (say, someone under indictment for using violence against a domestic partner).

*Id.*

In addition, a "robust majority" of district courts to consider the question post-*Bruen* have upheld § 922(n). *United States v. Posada*, No. EP-22-CR-1944(1)-KC, 2023 WL 3027877, at *6 (Apr. 20, 2023) (citing cases).[11]

---

[11] *See also, e.g., United States v. Alston*, No. 523CR00021FLRN1, 2023 WL 4758734, at *10–11 (E.D.N.C. July 18, 2023); *United States v. Evenson*, No. CR-23-24-BLG-SPW, 2023 WL 3947828 (D. Mont. June 12, 2023); *United States v. Adger*, No. 1:22-cr-102 (S.D. Ga. May 24, 2023); *United States v. Johnson*, No. 23-cr-41 (S.D. Al. May 3, 2023); *United States v. Smith*, No. CR 122-081, 2023 WL 3012007 (S.D. Ga. Mar. 29, 2023), *report and recommendation adopted,* No. CR 122-081, 2023 WL 3010178 (S.D. Ga. Apr. 19,2023); United States v. Now, No. 22-CR-150, 2023 WL 2717517, at *9 (E.D. Wis. Mar. 15, 2023), *report and recommendation adopted,* No. 22-CR-150, 2023 WL 2710340 (E.D. Wis. Mar. 30, 2023); *United States v. Jackson*, No. 1:22-cr-141, 2023 WL 2499856 (D. Md. Mar. 13, 2023); *United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Bartucci*, No. 1:19-cr-00244-ADA-BAM, 2023 WL 2189530; *United States v. Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023); *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023); *United States v. Rowson*, No. 22-cr-310, 2023 WL 431037 (Jan. 26, 2023); *United States v. Kelly*, No. 3:22-cr-37, 2022 WL 17336578 (Nov. 16, 2022); *United States v. Kays*, No. cr-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022). *But see United States v. Hicks*, No. W:21-cr-60-ADA, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (finding § 922(n) facially unconstitutional); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022) (finding § 922(n) unconstitutional as applied to

(continued . . . )

### A.    The Plain Text of the Second Amendment Does Not Protect Felony Indictees.

First, § 922(n) imposes no burden on self-defense by law-abiding, responsible citizens, i.e., the people who have Second Amendment rights. Thus, it regulates conduct that falls entirely outside the scope of the Second Amendment and is presumptively constitutional. Here, the defendant is not a law-abiding, responsible person, but instead was under indictment for a felony at the time of the current offense. For all the reasons discussed supra regarding felons, persons under indictment are not among the law-abiding, responsible citizens protected by the Second Amendment. *See, e.g., United States v. Evenson*, No. CR-23-24-BLG-SPW, 2023 WL 3947828, at *2 (D. Mont. June 12, 2023) ("§ 922(n)'s prohibition on persons under indictment from acquiring firearms is underpinned by the same considerations as felons in possession: each stand for the principle that unvirtuous persons [may] be disarmed (in this case, temporarily), while the case is pending").

Nor does the fact that defendant has not yet been convicted alter the analysis. Upon showing of probable cause, e.g., through an indictment, a defendant "may face substantial liberty restrictions." *United States v. Salerno*, 481 U.S. 739, 749 (1987). He may be searched incident to his arrest, *United States v. Robinson*, 414 U.S. 218, 224-226 (1973); strip searched, *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 322-323 (2012); detained pending arraignment, *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991); and detained pending trial with his assets frozen, precluded from hiring Sixth Amendment counsel of choice. *Salerno*, 481 U.S. at 739; *Kaley v. United States*, 571 U.S. 320 (2014). Despite the First Amendment freedoms of speech

---

defendant indicted for larceny but released on bail); *United States v. Sanchez-Tena*, No. 7:22-cr-160 (W.D. Tex. Nov. 15, 2022); *United States v. Quiroz*, 2022 WL 4352482, at *13 n.119 (W.D. Tex. Sept. 19, 2022) (finding § 922(n) facially unconstitutional).

and the press, those detained can be prohibited from receiving books and magazines from private parties. *Bell v. Wolfish*, 441 U.S. 540, 549-552 (1979). Similarly, an indictment can serve to temporarily restrict the right to acquire firearms. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 2156 (emphasizing the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees"). *See, e.g., United States v. Fencl*, No. 21-CR-3101-JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (pretrial release condition barring gun possession, 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment; instead, defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause")*, aff'd*, No. 22-50316 (9th Cir. Jan. 26, 2023) (opinion to follow); *United States v. Perez-Garcia*, 628 F. Supp. 3d 1046, 1053 (S.D. Cal. 2022) ("As a person who has been charged with a crime based on a finding of probable cause, Mr. Perez-Garcia would not be considered a 'law-abiding' or responsible citizen, so he is outside the plain text of the Second Amendment. Persons with criminal charges pending are routinely subject to significant restrictions on their constitutional rights once probable cause has been shown."), *aff'd sub nom. United States v. Garcia*, No. 22-50314, 2023 WL 2596689 (9th Cir. Jan. 26, 2023). Accordingly, because felony indictees are not ordinary, law-abiding citizens, the Second Amendment does not preclude the government from imposing firearms restrictions on that class of individuals.

### B.    This Nation's History and Traditions Support Prohibitions Against Felony Indictees Possessing Firearms.

Even if the Second Amendment's text were thought to cover defendants indicted for felonies, § 922(n) remains valid under *Bruen* because it squares with historical tradition. Three distinct historical analogues support § 922(n)'s constitutionality: (1) liberty restrictions on indicted defendants, including pretrial detention; (2) laws restricting the gun rights of groups deemed

dangerous or untrustworthy to obey the law; and (3) surety laws restricting the gun rights of people accused of posing a threat. In *Bruen'*s wake, district courts have found that each of these historical analogues confirm § 922(n)'s constitutionality.

> ### 1.    Section 922(n) is analogous to historical laws detaining indicted defendants prior to trial.

Section 922(n) is analogous to historical laws governing pretrial detention of indicted defendants. A "fundamental right to bail was not universal among the colonies or among the early states." *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981); see also *United States v. Perry*, 788 F.2d 100, 111 (3rd Cir. 1986) (observing that most "federal courts that have addressed the issue have held that there is no absolute right to bail"). While the Eighth Amendment forbids excessive bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Id.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed," *id.*, and "may ban bail in an entire class of cases." *United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010).

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"— and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2 (W.D. Pa. Oct. 6, 2022) ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law.").

The Judiciary Act of 1789—passed two years before the Second Amendment's ratification— embraced this principle. It provided that a defendant accused of a federal crime could

"be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which case it shall not be admitted but by [a court or judge] who shall exercise his discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

Moreover, at the Founding, capital cases encompassed a broad swath of criminal conduct. Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *Furman v. Georgia*, 408 U.S 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion"). "Capital punishment for felonies was 'ubiquit[ous]' in the late Eighteenth century and was 'the standard penalty for all serious crimes.'" *Medina*, 913 F.3d at 158, quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment). Thus,

> the public safety threat posed by pretrial indictees was not, in the main, a general societal problem at the founding, . . . because, at the time the Second Amendment was ratified, bail was not available for many crimes that were then treated as capital offenses but which today would be treated as felonies within § 922(n)'s scope. . . . The circumstances—the relative scarcity of non-detained felony indictees— likely explain the absence of a colonial-era statute like § 922(n) addressed specifically to pretrial indictees.

*United States v. Rowson*, No. 22-cr-310, 2023 WL 431037 (Jan. 26, 2023) (analogizing § 922(n) to the statute governing pretrial detention and release conditions and its firearm restriction, 18 U.S.C. § 3142(c)(1)(B)(viii), and citing post-*Bruen* cases upholding that provision).

The historical tradition of detaining those charged with serious crimes supports § 922(n)'s restriction on those individuals' right to receive guns. The power to detain necessarily

encompasses the power to impose some lesser liberty restrictions. Thus, for example, the Supreme Court has reasoned that "'it would be odd to conclude'" that the government cannot seize forfeitable assets on a grand jury's probable cause finding when that showing is "often sufficient to 'restrain *persons*.'" *Kaley*, 571 U.S. at 330 (quoting *United States v. Monsanto*, 491 U.S. 600, 615 (1989)) (emphasis in original); see also *Stephens*, 594 F.3d at 1039 (reasoning that Congress's power to ban bail implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" of a curfew and electronic monitoring). In the same way, it would be odd to conclude that being charged with a crime can justify pretrial detention and the freezing of forfeitable assets but cannot justify a temporary restriction on receipt of a firearm. Instead, the Nation's historical tradition of pretrial detention supports § 922(n)'s constitutionality under *Bruen*. *See, e.g., United States v. Alston*, No. 523CR00021FLRN1, 2023 WL 4758734, at *10–11 (E.D.N.C. July 18, 2023) ("*Bruen* instructs courts to consider 'how and why' the modern regulation and its purported historical analogue burden the right to self-defense. . . . [I]f an indictment can justify a total and immediate deprivation of liberty [through pretrial detention], it also justifies lesser deprivations—like limiting a defendant's ability to ship, transport, or receive a firearm. . . . Put differently, [§ 922(n)] accomplishes a similar 'why' through a less restrictive 'how'"); *Posada*, 2023 WL 3027877, at *6 ("If an indictment [was] constitutionally sufficient to trigger a complete prohibition on a defendant's Second Amendment rights [via pretrial detention] at the founding, then it must also be sufficient to temporarily restrict the right to acquire or transport arms while a felony indictment is pending") (cleaned up) (citing cases); *Slye*, 2022 WL 9728732, at *2 ("[i]t would be illogical to conclude" that it had authority to detain the defendant "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction")*; Fencl*, 2022 WL 17486363, at *3 (upholding 18 U.S.C. § 3142(c)(1)(B)(viii)

based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)").

> **2.      Section 922(n) is analogous to historical laws disarming unvirtuous or dangerous citizens.**

As in the context of felons discussed more fully *supra*, § 922(n) is analogous to historical laws disarming unvirtuous or dangerous citizens. *See, e.g., Rowson*, 2023 WL 431037, at 20 (finding that § 922(g)(1) bears a "significant resemblance[]" to § 922(n) for *Bruen* purposes). "[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 259–261 (2020). Similarly, "[t]he historical record shows that gun safety regulation was commonplace in the colonies." *National Rifle*, 700 F.3d at 200.

As with felons, the tradition of disarming dangerous or untrustworthy persons supports § 922(n)'s ban on indicted defendants' receipt of firearms. "Clearly, [r]egulations limiting or prohibiting access to firearms by specific groups in the interest of public safety have been part of the Nation's historical tradition since the earliest days of our Nation's founding." *United States v. Jackson*, No. CR ELH-22-141, 2023 WL 2499856, at *16 (D. Md. Mar. 13, 2023). "Furthermore, a felony indictment serves as a uniform and "objective criteria" to restrict access to firearms." *Id.* (citing *Rowson*, 2023 WL 431037, at *22 ("Section 922(n) imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison.")).

As *Jackson* recognized, Section 922(n) is "relevantly similar" to these historical precursors under the "two metrics" *Bruen* offered: "how and why the regulations burden" Second Amendment

rights. 2023 WL 2499856, at *17 (citing *Bruen*, 142 S. Ct. at 2133). As to "how" the statute operates, § 922(n), like its historical precursors, uses an objective criterion to categorically restrict a specific group's gun rights. And even there, "[c]ritically, § 922(n) does not entirely restrict an individual's Second Amendment rights, as it does not bar possession of a firearm. Rather, the statute is a narrow restriction that prohibits transporting and obtaining new weapons during the period of time in which a person is the subject of an active felony prosecution." *Id.* As to "why," *Jackson* noted, "[e]ven in a world in which the right to bear arms is zealously protected, it is not difficult to imagine why the government might have a particular, narrowly acceptable interest in preventing an individual from amassing a fresh arsenal while the proceedings that might ultimately end in his imprisonment are ongoing." *Id.* (cleaned up). Section 922(n) thus represents a permissible legislative judgment that a person's status as an indicted felon warrants temporarily precluding the person from acquiring new firearms.

### 3.    Section 922(n) is analogous to historical surety laws.

Finally, traditional English and American surety laws support Section 922(n)'s constitutionality. In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated,* 142 S. Ct. 2895 (2022). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; . . . he may demand surety of the peace against such person." 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769). The surety was "either a money payment or pledge by others 'in support of his future good conduct.'" *Young*, 992 F.3d at 791 n.12 (quoting David Feldman, *The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers*, 47 Cambridge L.J. 101,

104 (1988)). If the person against whom the accusation was made failed to "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." 4 Blackstone at 252. The surety was "intended merely for prevention, without any crime actually committed the party, but arising only from a probable suspicion that some crime [wa]s intended or likely to happen." *Id.* at 249.

The colonies adopted English surety practice. *See* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). For example, New Hampshire authorities could arrest a person who went armed in a threatening manner and "commit him to prison, until he the offender f[ound] such sureties as is required for his good behaviour." Acts and Laws of His Majesty's Province of New-Hampshire:  In New England 1-2 (1771) (1701 statute). Other early colonial laws contained similar provisions. *See* 1 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 52-53 (1869) (1692 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New England 91 (1901) (1702 statute). As in England,

> surety laws in the United States did not require a formal conviction; instead, a showing of "reasonable cause" by another citizen or "upon view" of a judge or justice of the peace was sufficient.
>
> Like surety laws, § 922(n) presumes that all individuals have a right to keep and carry firearms but imposes a burden on that right for a limited time upon a finding by a judicial officer or other legal process that an individual has participated in dangerous, disruptive, or otherwise felonious conduct. However, unlike surety laws, § 922(n) does not disturb an individual's ability to keep or carry any firearms that they already own.

*United States v. Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023) (cleaned up).

The historical tradition of surety laws supports modern gun restrictions on indicted defendants. See *Fencl*, 2022 WL 17486363, at *3; *Perez-Garcia*, 2022 WL 17477918, at *4-5; *Kays*, 2022 WL 3718519, at *4-5. Like surety laws, Section 922(n) presumes people have a right to bear arms and burdens that right only upon a specific objective showing. *Id.* at *4. Even then, it restricts gun rights only temporarily, while the indictment is pending. *Id*; *see* 4 Blackstone at 249-250 (explaining that surety law restrictions applied only for a specified time).

Just as surety laws generally required an individualized showing of threat or danger, *Bruen*, 142 S. Ct. at 2148, a felony indictment's probable cause requirement serves an analogous purpose. That is, Congress permissibly determined that an individualized showing of probable cause that a person has committed a felony makes the person categorically more likely to misuse any firearms he newly acquires, warranting temporary restrictions. *See Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942) (explaining that Section 922(n)'s predecessor statute applied to those who "demonstrated their unfitness to be entrusted with such dangerous instrumentalities.").

Like laws disarming dangerous or untrustworthy people, surety laws are "relevantly similar" to § 922(n) under the *Bruen* "why" and "how" metrics. *Bruen*, 142 S. Ct. at 2132-2133. Both Section 922(n) and surety laws serve public safety purposes. *See Fencl*, 2022 WL 17486363, at *3 (upholding pretrial release condition). And they do so in the same manner: by "temporarily burdening the Second Amendment rights of individuals reasonably likely to breach the peace." *Id.* Like the probable cause required for an indictment, surety laws applied to anyone "reasonably accused." *Bruen*, 142 S. Ct. at 2148-2149. And like surety laws, which contain exceptions based on a special bond, § 922(n) does not entirely ban publicly carrying firearms. Instead, it prohibits only "receipt" of new or additional guns while under felony charge, permitting a defendant to possess any guns already owned. Moreover, just as an accused person could overcome the surety

laws' restrictions by posting a bond, "§ 922(n) embeds its own mechanism for relief: resolution of the pending indictment." *Rowson*, 2023 WL 431037, at *24 (agreeing that surety laws are relevantly similar to Section 922(n)); *Jackson*, 2023 WL 2499856, at 17 (same). Surety laws and § 922(n) address the same basic problem in analogous ways. Accordingly, "[b]ecause it imposes a comparable burden and has a comparable justification to historical surety laws," § 922(n) is valid under the Second Amendment. *Gore*, 2023 WL 2141032, at *4.

<u>**CONCLUSION**</u>

WHEREFORE, the government respectfully requests that defendant's motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
Assistant United States Attorneys

_____/s/_____
Sitara Witanachchi
D.C. Bar No. 1023007
Andy Wang
D.C. Bar No. 1034325
Assistant United States Attorneys
United States Attorney's Office for D.C.
601 D Street, N.W., Fifth Floor
Washington, D.C. 20530
E-mail: Sitara.Witanachchi@usdoj.gov
Telephone: (202) 252-2420

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have caused a copy of the foregoing to be served by electronic means, through the Court's EFS system, upon counsel for the defendant, on this 2nd day of August, 2023.

/s/ Sitara Witanachchi
SITARA WITANACHCHI
Assistant United States Attorney